PRINCE LINE, LIMITED, OF NEWCASTLE, ENGLAND, v. STEGER et al.*
(No. 7507.)

(Court of Civil Appeals of Texas. Galveston. June 13, 1918. On Motion for Rehearing, Feb. 6, 1919. Dissenting Opinion Feb. 12, 1919.)

1. DAMAGES ⬤184—CONTRACTS—MITIGATION —EVIDENCE.

In an action by the owner of a vessel against a charterer who failed to provide cargoes according to contract, evidence *held* to warrant a finding that the owner would not have suffered any loss by reason of the charterer's breach of contract if it had accepted substitute cargoes offered.

2. SHIPPING ⬤58(1)—ACTIONS—DEFENSES.

Where the charterer of a vessel failed to furnish cargoes agreed upon, but offered substitute cargoes which the owner refused to accept, and finally secured another cargo, which was transported, *held* that in an action by the owner for damages the charterer was not precluded on the ground the vessel was held at his request from relying on the fact that if the substitute cargoes had been accepted, or any diligence used, no loss would have been suffered.

3. DAMAGES ⬤62(4)—MITIGATION—BREACH OF CHARTER PARTIES—WILLFUL BREACH.

Where defendant was unable to furnish a cargo of horses because the French government inspectors had not been able to inspect them, *held* that the failure of defendant to furnish the horse cargo pursuant to a contract with a vessel owner was not a willful breach, and the owner could not recover damages, where by the exercise of ordinary care it could have saved itself from loss.

4. DOMICILE ⬤10—EVIDENCE—SUFFICIENCY.

In an action by the owner of a vessel against one not in the state of Texas, and who was not personally served, evidence *held* to show that he was a resident of New York, and so the action was properly dismissed as to him.

5. SHIPPING ⬤58(1)—BREACH—DEFENSES.

Where the charterer of a vessel, being unable to furnish a cargo within the time fixed, contracted for another cargo, which was transported, and agreed to save the owner from any loss, but the agreement was conditional on his holding of the vessel, *held* that, where the owner refused to longer recognize any right under the charter party, it cannot recover on the conditional agreement.

## On Motion for Rehearing.

**6. SHIPPING ☞58(2)—ACTIONS—EVIDENCE.**

In an action by the owner of a vessel against a charterer who failed to furnish a cargo of horses according to agreement, evidence *held* to show that the owner of the vessel which transported another cargo of horses secured by the charterer did not do so on the latter's agreement to compensate the owner for any loss, but because it did not care to transport other cargoes.

**7. TRIAL ☞205 — INSTRUCTION — BURDEN OF PROOF.**

In an action by the owner of a vessel against a charterer who broke its contract by failure to furnish cargo according to agreement, *held* that the failure of the court to charge that the burden was on the charterer to sustain the defense that the owner would have suffered no loss had it used any diligence in accepting other cargoes was not error.

**8. APPEAL AND ERROR ☞750(7) — REVIEW — ASSIGNMENTS OF ERROR.**

In an action against the charterer of a vessel, where the trial court, as a condition to overruling a motion for new trial, required the charterer to remit a judgment over in his favor, *held* that assignments of error predicated on the judgment in favor of the charterer should not be disregarded on the ground that that matter was no longer in the case, but should be treated as a general attack on the verdict and judgment.

**9. APPEAL AND ERROR ☞742(1)—REVIEW—ASSIGNMENTS OF ERROR.**

Assignment of error, statement under which refers to the evidence set out on preceding pages 24–132 of the brief, a part of which had no bearing on the issues presented, need not be considered; the statement of the evidence being insufficient under rule 31 for the Courts of Civil Appeals (142 S. W. xiii).

Graves, J., dissenting.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by the Prince Line, Limited, of Newcastle, England, against E. D. Steger and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Harris & Harris and Edward F. Harris, all of Galveston, for appellant.

James B. & Charles J. Stubbs, of Galveston, and Gill, Jones, Tyler & Potter, of Houston (Frank C. Jones, of Houston, and James B. Stubbs, of Galveston, of counsel), for appellees.

PLEASANTS, C. J. This suit was brought by appellant against E. D. Steger, B. F. Yoakum, W. B. Ridgely, E. F. Cragin, W. B. Fariss, Hutchings, Sealy & Co., and the Missouri, Kansas & Texas Railway Company of Texas, to recover damages for the breach of a contract for the shipment of horses from Galveston, Tex., to La Pallice, France. The contracts sued on were executed by appellant as the carrier and E. D. Steger as the shipper, and were also signed by T. H. Andrews, agent of the above-named railway company, over whose lines the horses were to be transported to Galveston for shipment. The petition alleged that the other named defendants, except Hutchings, Sealy & Co., were partners of E. D. Steger in the transaction. Hutchings, Sealy & Co. were made parties under allegations that said firm held $20,000 which had been placed in their possession by defendant Steger to guarantee the performance by him of his said contract.

The defendant railway company answered by plea of non est factum, which was sustained by the uncontradicted evidence, and a verdict was instructed in its favor.

Hutchings, Sealy & Co. answered as stakeholders.

The defendants Yoakum, Ridgely, Cragin, and Fariss were served in New York with statutory notice. They made no appearance, and no judgment was rendered against any of them. Appellant contends that B. F. Yoakum was a citizen of this state, and judgment should have been rendered against him by default.

One of the two contracts sued on was for three voyages to be made by appellant's steamer Portuguese Prince from Galveston to La Pallice. The portions of the contract material to this appeal are as follows:

"That the said owners agree to carry, and the said shippers agree to ship, on said steamship, for three consecutive voyages from Galveston, Texas, to La Pallice, France, horses to be furnished by shippers as required, and as hereinafter provided, which trips are to be made without steamer being employed for any other purpose.

"That the steamer is to be employed for the carriage of horses on the aforesaid voyages, and that shippers shall pay to the owners $75.-00 per head for all horses that the steamer is able to accommodate, in accordance with the United States regulations and specifications, regarding the necessary fittings. (The estimated capacity of the steamer is between 950 and 1,050 horses.)

"Shippers agree to deliver horses to the said steamer at the dock or wharf or place where she may be lying, wharfage or other charges on the horses to be paid by shipper. Each horse to be fitted with a halter and suitable rope for tying up in stall provided, which halter will, being the property of the shippers, be taken ashore at the port of discharge, on the discharge of the horses.

"That after notice of readiness of the vessel to take on board the horses, not more than 48 hours shall be allowed to load the same. If more than 48 hours elapse before the horses are delivered to the vessel, shippers shall pay demurrage at the rate of eight cents per registered ton per day or part of day."

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The other contract was for three voyages of appellant's steamer Burmese Prince, and contains the identical provisions of the contract for the voyages of the Portuguese Prince above set out.

Plaintiff's petition, after alleging the execution of the two contracts and reciting the terms thereof, contains the following allegations:

"Acting under and in pursuance of said contracts, plaintiff and defendant carried out the provisions thereof as to the first trip of the steamship Portuguese Prince, and as to the first and second trips of the steamship Burmese Prince, and as the plaintiff performed in every respect its obligations as to the remaining three trips, namely, one trip to be made by the Burmese Prince and two trips to be made by the Portuguese Prince. That the defendant utterly failed and refused to perform his contracts in any and all respects relative to said remaining three trips, and did as to said three remaining trips violate and breach his said contracts, causing thereby to plaintiff damages due to said breach (in the sum of to wit,, $150,-000), which damages, though due and lawful demand therefor has been made by the plaintiff upon the defendant, defendant has utterly failed and refused to pay.

"That after making her first trip under said contract the steamship Portuguese Prince steamed from La Pallice, France, January 6, 1915, for the port of Galveston, where she arrived to receive her second cargo of horses on the 7th of February, 1915, but the defendant Steger utterly failed to provide said cargo of horses. and at his request and upon his repeated insistence and because of the lack of cargo or any cargoes of horses at Galveston said steamer was detained in said port until the 24th day of March, 1915, awaiting cargo, at which time, in compliance with the request of said Steger, and for his benefit and behalf, and as right and proper, the Portuguese Prince steamed from Galveston to New Orleans, reaching said port on the 26th day of March, 1915, where she was held awaiting to take on board a cargo of horses destined for Genoa to be furnished and shipped by Miller Bros. of Oklahoma, and applied to the said Steger's contract; said horses arrived at New Orleans April 5, 1915, and were loaded April 6, 1915, and the Portuguese Prince steamed from New Orleans April 7, 1915, and carried said horses to Genoa, Italy, where she finished discharging said cargo on, to wit, May 3, 1915, all of which delay being caused by the defendant, and not caused by the fault of said vessel, her, owners or agents.

"That the vessel was thus kept and detained and used thereby over and above the contract period of use and detention 64 days, including 10 extra steaming days, due to the greater distance to Genoa as compared with La Pallice; and the reasonable value of such use, keeping, detention, and extra steaming days was $1,250 per day, a total sum of $80,000. and additional coal was consumed, made necessary by said extra detention and steaming in the amount of 400 tons, of the reasonable market value of $3.30 per ton, being a total sum $1,320; that the extra cost for fodder, being the reasonable value thereof, on account of longer passage to

Genoa as compared with the distance from Galveston to La Pallice, was $2,160. That the distance from New Orleans, La., to Genoa, thence to La Pallice, France, is about, to wit, 2,400 miles greater than from Galveston direct to La Pallice. That the freight money which would have been earned under the contract on 1,200 horses at $75 per head is the total sum of $90,000. That plaintiff admits that it received as freight money on the substituted cargo, $82.50 per head for 1,200 horses from New Orleans to Genoa, making a total of $99,000, less 5 per cent. commission paid to M. & R. Warriner, New Orleans, La., for procuring said substituted cargo, being the sum of $4,950 commission, leaving a remaining sum as freight money from New Orleans to Genoa on said substituted cargo, the sum of $94,050.

"That the expense of earning said $90,000, as per contract, being 1,200 horses at $75 per head from Galveston to La Pallice, would have been $32,222.16, which would have left the net earning or profit to the plaintiff on the trip of $57,777.84. The expense of earning the said $99,000 by hauling the substituted cargo from New Orleans to Genoa was $42,914.72, leaving a net income or profit arising therefor in the sum of $57,085.28, being $692.56 less than the net earning or profit which would have arisen had the contract cargo been hauled from Galveston to La Pallice; that the number of days which the steamer would have taken under the charter party from La Pallice to Galveston to La Pallice was 56 days; the actual number of days required from La Pallice to Galveston to New Orleans to Genoa was 118 days, and the net profit the steamer would have earned in said extra 62 days consumed by reason of the default of the defendant is the sum of $63,968.19, which, added to the $692.56 above set forth, makes the total loss to the plaintiff upon this voyage the sum of $64,660.75.

"That, owing to said breach of contract by defendant, the plaintiff had to hunt in the markets of the world employment for the Portuguese Prince in lieu of the third voyage of said boat, which had been contracted for by said defendant, and therefore as in duty bound the plaintiffs succeeded in getting a cargo of horses to be hauled from New York City to Brest, France, and the said Portuguese Prince proceeded from Genoa, Italy, May 3, 1915, to New York City, reaching said city May 22, 1915, and thereupon loaded 1,183 horses, steamed May 24, 1915, from New York, and reached Brest June 14, 1915, and received for transportation $50 per head for the horses, making a total sum of $59,150, said horses having been shipped by Mayer & Carpenter for account of J. H. Dunn of London, England, Borgham & Swift, agents.

"The plaintiff admits having received said $59,150 as freight money on the substituted cargo, less 5 per cent. commission paid by plaintiff to Paul F. Gerhard & Co., and Thomas Harling & Son of New York City, said commission being $2,957.50, leaving the remaining sum as freight money from New York to Brest on said substituted cargo the sum of $56,192.50.

"That the freight money which would have been earned under the charter party sued on, on 1,183 horses at $75 a head, would have been $88,725, and the expense of earning said freight money would have been $29,122.75, which would have left the net earning or profit to

the plaintiff on the trip of $29,602.25; the expense of earning the said $59,150 by hauling the substituted cargo from New York to Brest was $17,336.62, and plaintiffs received on account of demurrage or detention in New York, and on behalf of said Dunn, the sum of $2,250, which it hereby credits on account of damages for delay and otherwise herein sought by plaintiff, thus making the net income or profit arising from said substituted cargo the sum of $44,063.60, being $15,538.65 less than the net earnings or profit which would have arisen had the charter party been carried out as to this voyage. That the number of days which the steamer would have taken under the charter party was 47 days; the actual number of days required for the substituted cargo was 42 days; that the plaintiff therefore credits as against this claim for detention, damages, and delay the average value of the net profits of the steamer at the rate of $1,267.65 per day, amounting for said 5 days to $6,340.67, leaving the total loss to the plaintiffs upon this voyage herein set forth the sum of $9,198.16, besides the commission item above of $2,957.50.

"That after making her second trip under said contract, which trip was made at Steger's request to St. Nazaire, France, the steamship Burmese Prince steamed from St. Nazaire, February 1, 1915, for the port of Galveston, where she arrived to receive her third cargo of horses on the 27th day of February, 1915, but that defendant Steger utterly failed to provide said cargo of horses, and at his request and upon his repeated insistence, and because of the lack of any cargo of horses to be had or obtained at Galveston, said steamer was detained in said port until about the 12th day of March 1915, waiting cargo, at which time, and for the benefit and in behalf of Steger, and as was right and proper, the Burmese Prince steamed from Galveston for New York, reaching said port the 19th day of March, 1915, where she was held, waiting a cargo of horses destined for La Pallice, France, to be furnished and shipped by and on account of Dowler, Forbes & Co., and applied to said Steger's contract. Upon the arrival of said horses at New York they were promptly taken on board, and the Burmese Prince steamed from New York March 24, 1915, and carried said horses to La Pallice, where she finished discharging said cargo on or about the 10th day of April, 1915—all of which delay was caused by the defendant, and not caused by the fault of the said vessel, her owners and agents. The vessel was thus kept, detained, and used thereby over and above the contract period of use and detention, to wit, about 20 days, and the reasonable value of such use, keeping, and detention was $1,250 per day, a total sum of $25,000.

"Additional coal was consumed, made necessary by said extra detention, use, and keeping, in the sum of 75 tons, of the reasonable market value of $3.30 per ton, being a total sum of $247.50. That the extra working cost, being for wages, provisions, stores, marine insurance and storage, made necessary by said extra use, keeping and detention, was the sum of $2,310. The extra war risk insurance made necessary by said extra detention, use, and keeping was the sum of $400. That the freight money which would have been earned under the original contract on 1,111 horses at $75 per head is the sum of $83,325. The plaintiff admits that it received as freight money on the substituted cargo $50 per head for 1,111 horses, a total of $55,550, less 5 per cent. commission paid to Gerhard & Co. and Phillip Segaller of New York, for procuring said substituted cargo, being the sum of $2,777.50 commissions, leaving a remaining sum as freight money from New York to La Pallice, the amount of $52,777.50.

"That the expense of earning said $83,325, as per original contract, being 1,111 horses at $75 per head from Galveston to La Pallice, would have been about $28,073.20, which would have left the net earning or profit to the plaintiff on the trip of $55,251.70. The expense of earning the said $55,550 by hauling the substituted cargo from New York to La Pallice was, to wit, about $24,811.25, leaving a net income or profit arising therefrom in the sum of $30,738.75, being $24,512.95 less than the net earnings or profit which would and should have arisen out of the contract cargo had it been hauled from Galveston to La Pallice.

"That plaintiff collected 3 days' demurrage at La Pallice at the rate of £80 sterling per day, a total of £240 sterling or converted into American money at $4.81 per pound, being the sum of $1,164.40, which plaintiff admits as a credit in behalf of defendant Steger. That the number of days which the steamer would and should have taken under the charter party for the trip in question was 51 days; the actual number of days required for the substituted trip as above set forth was 69 days; and the net profit the steamer would have earned in said extra 18 days consumed by reason of the default of the defendant was the sum of $19,500.34, which, added to $24,512.95, makes the total loss to plaintiff upon this voyage the sum of $44,013.29.'"

The prayer of the petition is for recovery of damages in the sum of $150,000, with interest from January 1, 1915.

Defendant Steger answered by general and special exceptions, by general denial and special pleas, alleging that both of said steamers were taken away from said defendant Steger in an unreasonable time, no specified time being named in the contract during which time they should remain on demurrage, and that plaintiff, immediately upon arrival of said steamers in port and immediately upon the expiration of 48 hours after the arrival of each steamer, demanded excessive, unreasonable, and outrageous demurrage, to wit, the sum of $750 per day in lieu of the rate named in the charter party and contract which amounted to about $250 per day. Defendant further alleged that, both of said steamers having been taken away from him by plaintiff at the expiration of 48 hours after arrival, and said Steger having been declared in default, it was made the duty of the plaintiff, under the law, to use ordinary care in procuring for all of said remaining three voyages of said vessels substituted cargoes, so as to save or minimize the loss and damages, not only to the defendant Steger, but to the plaintiff itself, and that, had plaintiff exercised ordinary care in

procuring said substituted cargoes for the said remaining three voyages no loss or damage would have been sustained.

Defendant Steger further pleaded that, before he was in default and within a reasonable time under the demurrage clause of said contracts, he tendered and offered to plaintiff a' shipment for the full capacity of both said vessels of 8,000 tons of hay, the cargoes to be carried from Galveston, Tex., to La Pallice, France, and agreed with plaintiff to pay therefor the sum of $15 per ton for each voyage or $120,000 for each voyage made in transporting said hay, and agreed at the same time to pay all expenses of remodeling said vessels to accommodate hay instead of horses, so as to net the plaintiff $120,000 freight for each voyage, instead of $75,000, the freight named in the charter party to be paid for transporting 1,000 horses.

Defendant further pleaded that, in lieu of the banker's guaranty provided for in the charter parties, $20,000 in cash was deposited by E. D. Steger in the bank of Hutchings, Sealy & Co., of Galveston where said deposit still remained at the time of the trial, to protect plaintiff in all engagements of said E. D. Steger as contained in said charter parties, and he prayed, plaintiff having suffered no loss or damage except through its own negligence, that he, said Steger, should go hence without day, and have decreed to him the $20,000 cash belonging to him on deposit in said bank, and he prayed for his costs.

By cross-action he asked for recovery of his $20,000 cash deposited in said bank, and for damages for breach of contract to transport 24,000 tons of hay, 8,000 tons to the vessel for each of the remaining voyages setting up his agreement with plaintiff to transport same at $15 per ton, and his readiness and willingness to load said hay and to pay his freight in advance, pleading a contract he had with the French government to ship 50,000 tons of hay, 24,000 tons of which he had contracted to ship by said three steamers. He alleged the breach of this contract, as well as the contract for shipment of the horses, and asked in his cross-action a judgment for breach of contracts to ship his horses in the sum of $75,000 and breach of his contract to accept and carry his hay in said vessels in the sum of $120,000.

By supplemental petition plaintiff specially denied each and all of the material allegations of defendant Steger's answer and cross-action.

The case as thus made between Steger and plaintiff was submitted to a jury upon special issues, the issues submitted and the findings of the jury thereon being as follows:

"(1) Did the plaintiff and its agents use such care to avert or reduce the damage arising from defendant Steger's breach of his contract for the performance of the second trip of the Portuguese Prince as a person of ordinary care would have done under the circumstances? Answer Yes or No."

To this question the jury answered, "No."

"(2) Did the plaintiff and its agents in sending the steamer Portuguese Prince on its third voyage to New York and taking cargo of horses to Brest, France, use such care as one of ordinary prudence would have done under the circumstances to avert or reduce the damages arising from the defendant Steger's previous breach of the charter party for that vessel? Answer Yes or No."

To this question the jury answered, "No."

"(3) Did the plaintiff and its agents use such care as above defined to avert or reduce the damages arising from the defendant Steger's breach of the charter party of the Burmese Prince by the failure to furnish cargo of horses on its third voyage and provide security, as one of ordinary care would have done under the circumstances? Answer Yes or No."

To this question the jury answered, "No."

"(4) Did the defendant Steger offer plaintiff's agents cargoes of hay amounting to 24,000 tons at $15 a ton for the three voyages in controversy, and offer to pay for tearing out the horse fittings? Answer Yes or No."

"To this question the jury answered "Yes."

"(5) If you answer interrogatory 4 'No,' you need not answer this one at all; but, if you answer 'Yes,' then state whether the agents of the plaintiff agreed to accept the cargo of hay at the price stated, and release the defendant from the charter parties? Answer Yes or No."

To this question the jury answered, "Yes."

"(6) Were the cargoes of hay referred to in interrogatory 5 ever in fact tendered; that is, offered for loading to the plaintiff or its agents? Answer Yes or No."

To which question the jury answered, "Yes."

"(7) Should plaintiff or its agents, exercising such care as one of ordinary prudence would have exercised at the time and under the circumstances when the cargo of grain was tendered by the Steele Company for loading the Burmese Prince, have accepted the same or not? Answer Yes or No."

To this question the jury answered, "No "

"(8) Could plaintiff have saved all loss and damage by the exercise of ordinary care in obtaining cargoes for the last two voyages of the Portuguese Prince? Answer Yes or No."

To this question the jury answered, "Yes."

"(9) Could plaintiff have saved all loss and damage by the exercise of ordinary care in obtaining cargo for the last voyage of the Burmese Prince? Answer Yes or No."

To this question the jury answered, "Yes."

Upon this verdict, judgment was rendered that plaintiff take nothing by its suit, and that defendant recover of plaintiff the sum of $24,000 as damages for the breach by plaintiff of the contract to transport defendant's hay, and that defendant also recover the $20,000 on deposit with Hutchings. Sealy & Co.

Upon motion for new trial the court, as a condition to overruling the motion, required the defendant to remit the $24,000 damages recovered by him. This remittitur was filed, and appellee's right to recover this amount is not involved in this appeal.

The evidence shows that when the Portuguese Prince reached Galveston on February 7, 1915, to receive her second cargo of horses, appellee Steger, because of inability to obtain their inspection by officers of the French government, to which government he had contracted to sell the horses, could not furnish horses for shipment in accordance with his contract. This steamer remained in Galveston until March 24th, when it went to New Orleans and took on a cargo of horses for Miller Bros. of Oklahoma, and carried them to Genoa, Italy. This shipment of horses was taken by appellant under a contract made by or through Steger with Miller Bros. This boat did not return .to Galveston after its voyage to Genoa with the Miller Bros.' horses, but went to New York, and there obtained a cargo of horses which it transported to Brest, France.

There is evidence showing that the costs and expense of the long delay of the Portuguese Prince at Galveston and waiting for the Miller Bros.' horses, and the difference in net profits received for the transportation of the Miller Bros.' horses and the shipment from New York to Brest, and the profits appellee would have received for transporting two cargoes of horses from Galveston to La Pallice under its contract with appellee Steger amounted to the sums claimed by appellant as damages for the breach of said contract by Steger.

The steamer Burmese Prince arrived in Galveston on February 27, 1915, to take her third cargo of horses under the contract with appellee Steger, but appellee failed to furnish the shipment of horses in accordance with his contract. This steamer remained in Galveston until March 12th and, being unable to obtain the shipment of horses from the appellee or shippers at Galveston, went to New York and secured a shipment of horses from that port to La Pallice, France.

There is evidence that the difference between the net profits to the Burmese Prince for transporting the horses from New York to La Pallice and what it would have made if appellee had furnished the horses for shipment at Galveston and the expense to said steamer caused by the failure of appellee Steger to furnish the shipment of horses in accordance with his contract amounted to the sums claimed by the appellant.

There is no question as to the failure of the appellee Steger to furnish the horses for shipment in accordance with the terms of his contract with appellant, and the trial judge so found, and the correctness of the judgment depends on whether the findings of the jury that appellant could have saved all loss and damage by the exercise of ordinary care to obtain other cargoes in lieu of the three cargoes of horses which appellee Steger failed to furnish are sustained by the evidence.

Under appropriate assignments of error appellant complains of the charge of the court submitting each of the issues before set out, on the ground that there is no evidence to authorize the submission of such issues.

The first assignment is as follows:

"The court erred in overruling the following objection and exception made by the plaintiff to submission of question No. 1, viz.: 'Objection and exception are made to question No. 1 for this, that it is a submission of the issue therein contained to the jury, and is not warranted by the evidence in the cause, the evidence revealing beyond dispute and beyond reasonable difference in the minds of men that plaintiff used that care and diligence that a person of ordinary care would under similar circumstances to reduce and avert the damages from Steger's breach of the contract for the performance of the second trip of the Portuguese Prince, and the evidence further showing that the vessel Portuguese Prince upon said trip was held in port, not alone for the purpose of securing cargo, but also in response to the continued persistent demands of Steger that the boats be held at said port waiting the arrival of Steger's horses to be transported thereon; that said vessel arrived February 7th, and went on demurrage February 11th and a reasonable time to hold the boat on demurrage rate in the charter party ceased on the 13th day of February, and that thereafter negotiations were had by Steger, resulting in subchartering the boat to Miller Bros. by the charter party in evidence dated March 3d, for delivery of horses March 12th, and that, owing to delay on the part of Miller Bros., acting under Steger's charter party to them, and the interposition of the Texas quarantine, plaintiff and defendant understood the matter alike, and thereafter the Portuguese Prince steamed for New Orleans, and on the arrival of the horses took them for account of E. D. Steger to Genoa, and that the legal effect of the transaction from the testimony herein is such as to forever preclude and prevent defendant Steger from complaining of or availing himself of the defense as to said voyage of the Portuguese Prince that plaintiff did not exercise due diligence to avert or reduce the damage relative to said second voyage of the Portuguese Prince.'"

[1] Under the second, third, fourth, and fifth assignments of error appellant complains of the submission to the jury of the issue of whether appellant could have, by using ordinary care to obtain other cargoes, saved all loss and damage occasioned by the failure of Steger to comply with his contract. The main proposition under each of these assignments is:

"Where the evidence in support of an issue by one having the burden of proof thereon is so slight that reasonable minds could not arrive at a different conclusion with reference thereto, the court should instruct the verdict for the other party."

The trial of the case in the court below consumed two weeks' time. A large number of witnesses testified, and the statement of facts covers many typewritten pages, but the fact issues presented by these assignments of error only require that from the mass of testimony in the record we find sufficient

evidence to sustain the findings of the jury that, by the exercise of ordinary care in obtaining other cargoes, the appellant could have saved all loss and damage resulting from the failure of Steger to furnish the cargoes of horses in accordance with his contract.

The testimony shows that during the months of February and March, 1915, the exports from the city of Galveston included the following:

| | | |
|---|---|---|
| February, 1915.......... | 450,793 | bales of cotton. |
| | 2,700 | round bales. |
| March, 1915............... | 369,332 | bales of cotton. |
| | 4,529 | round bales. |
| February, 1915.......... | 17,716 | long tons of oil cake. |
| March, 1915............... | 8,837 | long tons of oil cake. |
| February, 1915.......... | 6,400 | tons of meal. |
| March, 1915............... | 3,460 | tons of meal. |
| February, 1915.......... | 3,555,366 | bushels of wheat. |
| March, 1915.:............. | 2,931,100 | bushels of wheat. |

There was a great scarcity of ships to carry these exports, and ocean freight rates advanced rapidly and reached a very high figure. The contracts under which a large portion of these exports were shipped were made while the two ships of appellant before named were at Galveston and appellant had found that appellee Steger was unable to comply with his contract to furnish the cargoes of horses. No effort was made by appellant after it found that Steger could not furnish the horses to obtain any substitute cargoes other than horses.

While the testimony is conflicting upon the question of the expense appellant would have incurred in removing the fixtures placed in his ships to properly fit them for conveying the horses, and the profits appellant would have made by taking cargoes of cotton in lieu of the horses, there is testimony to justify a finding that the cotton cargoes would have netted appellant more than it would have made by carrying Steger's horses under its contract with him.

Steger testified that after the arrival of the Portuguese Prince to receive its second cargo he came to Galveston, and offered appellant cargoes of hay for the two voyages of that ship and the one of the Burmese Prince for which he was unable to furnish the horses. He testified:

"At that time, February 20, 1915, I had a contract for the shipment of 50,000 tons of hay to France, to La Pallice and St. Nazaire, and we were shipping from Galveston or Texas City. I came to Galveston. * * * I told him (David Warriner, the agent of appellant) that the contract was for 50,000 tons, and that we could begin to ship as soon as the vessel—one was then in port, my recollection is—as soon as the vessel could be fitted for it, and proposed to pay for the fitting of the vessel myself for the hay. I offered to pay for dismantling the vessel, and Mr. Warriner got the detail of the ship and figured what hay the ship would carry. I was figuring on using both vessels. Mr. Warriner figured that by taking out the horse fittings and space that had to be reserved for coal and

men he could put into the vessel 8,000 tons. I had his figures for weeks. I gave him the rate I was willing to pay, $15.00 a ton, and he agreed to carry the hay as a substitute cargo for horses. He agreed that I might use the vessels for the remainder of the trips for hay instead of horses; there were three remaining trips."

A short time after this agreement was made the agent of appellant notified Steger that it would not take the hay in lieu of the horses. Steger further testified:

"I had the hay and could, and would, have loaded both vessels with hay. Of the 24,000 tons that I contemplated carrying on these three vessels, I shipped 4,000 tons at $16 per ton, 2,000 pounds each. I shipped 30,000 tons of the 50,000. The other 20,000 tons were never shipped, because it was impossible to get vessels at a reasonable price to ship on. * * * I wished always to hold the boats for horses, but when they told me they wouldn't be held for horses I was trying to get something else."

The evidence shows that the two ships were of approximately the same size and carrying capacity.

Mr. Sgitovich, a witness for appellant as to the relative profits to the ship owner from a cargo of horses at $50 and $75 per head and a cargo of hay at $15 per ton, testified as follows:

"4,860 tons of hay at $15 is $72,900, long ton. Short ton would be approximately 10 per cent. less. Short tons would stow 5,443; at $15 per ton would bring it up to $81,645. I figured on 1,111 horses at $50 per head, $55,550. The difference in favor of the hay is about $26,000. Assuming that 6,857 tons of hay could be carried, on the basis of 70 feet stowage, at $15, would amount to $102,750, and the difference between that and $55,550 would be $47,200. If there could be 6,857 tons of hay carried, the vessel would receive $47,200 more than for carrying the 1,111 horses at $50; 1,111 horses at $75 would be $83,325. Taking the figures for the carriage of the hay, $81,645, leaves a difference in favor of the horses of $1,680. Assuming that it cost $15 per head to feed and care for the horses, the cost of feeding and caring for 1,111 horses would be $16,665. That, deducted from $83,325, leaves $66,660 net revenue on the horses, and that, deducted from $102,750 (freight on 6,857 tons of hay at $15 on 70 feet basis), leaves a difference in favor of hay of $36,090. * * *

"Dead weight cargo is cargo such as grain, cotton seed meal, iron, and that class of cargo. We call it dead weight because you can always put the boat down to her full dead weight capacity without occupying her entire cubic capacity. * * * The cost of taking out the horse fittings would be at least $1,000. * * * I have not in these computations made allowance for all items that ought to be deducted from the gross earnings in order to arrive at net earnings of these cargoes. I have not, for instance, taken into consideration the question of additional time consumed. That is the principal item. I do not know positively whether hay is chartered on the long or short ton. I

know my calculations have always been made on the long ton or English ton."

Steger testified that the hay could have been pressed to a density of 70 cubic feet to the ton, and his agreement to pay $15 per ton was on that basis. He also testified, as above stated, that he had the hay in Galveston with which to load the ships.

It cannot be reasonably inferred from any of the testimony that the difference in the time that it would have taken to put the hay in the ship and the time it would take to place the horses on board would reduce the gross earnings from the hay cargo as much as $36,000, the excess of the gross earnings from the hay cargo over the earnings from the horse cargo, as fixed by the witness Sgitovich.

We think this evidence is sufficient to sustain the finding that the appellant would not have suffered any loss or damage by reason of Steger's breach of his contract if it had accepted the cargoes of hay offered it by Steger in lieu of the horses.

[2] But, as set out in its first assignment of error, appellant insists that Steger is precluded from claiming that appellant should have accepted the cargoes of hay or used any diligence to procure other cargoes in lieu of the horses for the second voyage of the Portuguese Prince, because the evidence shows that said ship was held in the port of Galveston in response to the persistent demands of Steger that it be kept until the arrival of his horses, and that through Steger's negotiations the ship was subchartered to Miller Bros. on March 3d for horses to be delivered to the ship at New Orleans on March 12th, and the cargo of horses furnished by Miller Bros. was transported by appellant by Steger's procurement and consent.

We do not think Steger's attitude in regard to holding the ship for his horse and his connection with the Miller Bros. charter party is inconsistent with his claim that appellant cannot hold him liable for damages for the breach of his contract which it could have averted by the use of ordinary care to obtain another cargo after it found that Steger could not deliver the horses for shipment under his contract. Steger testified that he was anxious to keep the ships under his contract for transportation of his horses, and in order to do this was willing to pay demurrage demanded by appellant, but if appellant would not do this he wanted appellant to substitute the hay in lieu of the horses, as it had agreed to do. His attitude in regard to the ships obtaining other cargoes is shown by his answer to the following questions propounded to him by counsel for appellant:

"Q. Did you mean to be understood in any of these hay conferences as abandoning your contract rights to the Burmese Prince and Portuguese Prince, did you? A. I never did. If they were going to take them away from me I wanted them to ship my stuff I offered them to ship. I was still expecting at that time to be able to furnish horses for the Burmese Prince when she would come in. I was expecting inspectors, either fresh ones or some of those at work, to be turned over to me. They had a number of inspecting ports in the United States then, and not enough to go around. It would be a matter of comparatively few days after I got hold of the inspectors before I would have been able to deliver horses to shipside. "Q. Isn't it a fact that, inasmuch as you always expected to get the horses and never notified Mr. Warriner you couldn't get the horses, isn't it a fact that that explains why you did not make any protest by your letters or documents against plaintiff's not moving the hay? Isn't it a fact that, inasmuch as you always expected to get the horses and never notified Mr. Warriner that you could not get the horses, isn't it a fact that that explains why you did not make any protest by your letters or documents against Warriner for not carrying hay? A. I preferred them to wait for horses, but protested most vigorously in Mr. Steele's office in the presence of Mr. Warriner against his not carrying the hay after the boats were taken away from me. I can't recollect as to the date— it was soon after these boats were taken away from me. It was after this trouble had all come up, and bills were being presented to me, or I had been notified bills would be presented to me. It was several months after March. At that time I protested vigorously at their taking the boats away from me and the failure to take hay."

In answer to the question if he did not send a telegram while the Portuguese Prince was at Galveston, offering to pay $5,000 if ship was held to await his horses, he testified:

"I sent that telegram and made this offer (to pay the $5,000) because of the fact that I had $30,000 profit in each trip of this vessel (referring to horse shipments), and I was willing to pay $5,000 in order to have the vessel or the two vessels preserved for one or more trips or as many as I could use them for, and because of the further reason that it would have embarrassed me very much in my contracting business to have had the ships taken away from me except in an agreeable way. * * * I was under contract to ship these horses on these vessels, and was doing my utmost always to hold them for the horses, but if they were not going to permit me to wait until my inspectors came, then I was trying to agree to any reasonable thing they wanted to do with the vessel and pay whatever amount was reasonable if they used it in any other way. I certainly did want the Portuguese Prince and Burmese Prince in February and March, 1915. I had horses waiting for inspectors. I had horses, but I couldn't deliver them—until the French government was able to give me inspectors to inspect the horses I could not ship them."

The undisputed evidence shows that the ship was not kept at Galveston at Steger's

request. Mr. Warriner, the agent of appellant at Galveston, testified:

"We didn't hold the boat here at anybody's request, but because we were not able to find any profitable business for her earlier. * * * When the Portuguese Prince was detained here nearly six weeks, we used every effort to obtain other employment for her. . Mr. Steele and ourselves were using every effort in that direction. That is the only purpose for which she was held here—she was not held at the request of Mr. Steger. Mr. Steger telegraphed to various horse dealers. I did not telegraph to any horse dealers—I telegraphed to our people in New Orleans; they were in communication with New York."

Our conclusion is that the evidence is sufficient to sustain the findings of the jury, and none of the assignments above mentioned can be sustained.

[3] There was no willful breach of his contract to furnish the horses on the part of Steger, and, under well-settled principles of law if appellant could by the exercise of ordinary care have saved itself from loss by reason of Steger's inability to furnish the cargo of horses, it was its duty so to do, and it cannot recover from Steger damages which it could have averted by the use of ordinary care. Heilbroner v. Hancock, 33 Tex. 715; Jones v. George, 61 Tex. 345, 48 Am. Rep. 280; Railway Co. v. Becht, 21 S. W. 971; Steamship Co. v. Card (D. C.) 59 Fed. 159; Warren v. Stoddart, 105 U. S. 225, 26 L. Ed. 1117.

The case is not one which called for a charge upon the burden of proof; and, if a charge upon that issue had been necessary, the charge requested by plaintiff, the refusal to give which is complained of under the sixth assignment of error, clearly misstated the law, and was properly refused.

The seventh and eighth assignments of error complain of the refusal of the court to instruct the jury to return a verdict in favor of plaintiff. It follows from what we have said in discussing the first five assignments that the court did not err in refusing to instruct the jury to find for plaintiff, and these assignments cannot be sustained.

[4] The ninth assignment complains of the action of the court in refusing to instruct the jury to return a verdict for plaintiff against the defendant B. F. Yoakum. As shown in our statement of the pleadings, Yoakum was made a party defendant under allegations that he was interested as a partner of Steger in the contract for the shipment of the horses. He was served with notice in New York, no citation having been served upon him in this state. He filed no answer in the case. In regard to Yoakum's residence Steger testified:

"Benjamin F. Yoakum, I think, claims to live in Texas—he is in New York City—a railroad man. He is a native Texan. Mr. Yoakum's business address in New York is 71 Broadway. I have known Benjamin F. Yoakum for something over 30 years. I knew him when he lived in Galveston, with the Santa Fé. * * * I have known Mr. Yoakum more or less intimately since I first met him. We were thrown a good deal together. I met him in Texas, in St. Louis—I am not sure, but it seems to me that he went to St. Louis before he went to New York. He has been in New York for a number of years. I do not know that at the time of this transaction and continuously since that time that Mr. Yoakum claimed he was a resident of Texas. I don't know where he claims his residence now. I think I testified yesterday that he claims to be Texan, residing in New York, or something to that effect. I don't remember that I testified that Mr. Yoakum claimed to be a citizen of Texas. So many things enter into where a fellow's residence is —we used to say where he had his washing done, and I don't know."

We think this evidence sustains the court's finding that Yoakum was a resident of New York, and, not having been served with citation in this state, and having filed no answer, the court was without jurisdiction to render a personal judgment against him.

Assignments 10 and 11 complain of the verdict and judgment in favor of Steger for $24,000 on his cross-action for damages for the failure of appellant to comply with its contract for the shipment of hay. As we have before stated, this judgment was remitted by Steger upon the hearing of plaintiff's motion for a new trial, and the correctness of that verdict and judgment is not in issue on this appeal. The reason for presenting those assignments is not apparent. Any error in that verdict and judgment cannot possibly affect the portion of the judgment involved on this appeal. The assignments are therefore overruled without discussion.

[5] The twelfth and thirteenth assignments assail the verdict and judgment as contrary to the charge of the court and the undisputed evidence, in that the court instructed the jury that J. H. W. Steele Company was the agent of Steger "in negotiations relative to the performance or nonperformance of the charter parties, and Steger was bound by the acts of his agents with respect thereto," and that the Steele Company, by letter of March 3, 1915, promised plaintiff that Steger would be responsible for any damages that plaintiff might sustain in taking the Miller Bros. cargo of horses from New Orleans to Genoa, and the evidence further shows that the Steele Company, as agents of Steger, participated "in all the transactions relative to the moving and taking of cargoes of (both) said vessels and were fully conversant of said movements, and did not protest against the same."

There is no merit in these assignments. As we have previously said, the efforts of

Steger to obtain the Miller Bros.' horses as a substitute cargo for his horses were made for the purpose of keeping alive his charter party contracts, and his offers to appellant were conditional upon, to state it in his words, the ships not being taken away from him; and, when appellant refused to longer recognize any right in him under his charter parties, his conditional promises were no longer binding upon him. The failure of Steele & Co. to protest appellant's acts in taking the ships from Steger could not affect the latter's right to insist that, if appellant would not hold the ships for his horses, it must use ordinary care to obtain such substitute cargoes as would prevent loss by reason of his breach of the contract.

The remaining assignments of error all relate to the judgment in Steger's favor for $24,000, and, for the reasons before stated, are not material to any issue involved in this appeal.

We are of opinion that the judgment should be affirmed; and it has been so ordered.

Affirmed.

### On Motion for Rehearing.

After giving full consideration to the very able motion for rehearing filed by counsel for appellant, the majority of the court have reached the conclusion that it should not be granted. Justice GRAVES dissents from this conclusion and will file a written statement of the grounds of his dissent.

The question of whether the trial court erred in submitting to the jury the issue of the exercise of ordinary care on the part of appellant to avert or reduce the damage arising from the failure of appellee Steger to comply with his contract to furnish a cargo of horses for the second voyage of the steamer Portuguese Prince is by no means free from doubt, but the question as presented is one of law, and therefore within the jurisdiction of the Supreme Court, and we feel constrained to follow the general rule of this court and solve the doubt in favor of the judgment of the trial court.

We adhere to the conclusion stated in our main opinion that there is evidence sufficient to sustain the findings of the jury that appellants by the use of ordinary care could have obtained other cargoes in lieu of the horses which appellee Steger failed to furnish in accordance with his contract, and that the profits which appellant would have made from the transportation of the substituted cargoes would have equaled what it would have made if appellee Steger had furnished the cargoes of horses and appellant had transported them under its contract with him. The evidence as a whole upon this issue is contradictory and not satisfying, but we cannot say it does not raise the issue, and that is the only question presented by the assignments.

[6] Appellant's contention in regard to the second voyage of the steamer Portuguese Prince is that the Miller Bros.' horses having been transported under the contract made by Steger with Miller Bros., and for account of Steger, and he having expressly agreed to compensate appellant for any loss it might sustain by transporting the Miller Bros.' horses in lieu of the horses which Steger had contracted to furnish for said voyage, the issue of whether appellant used ordinary care to avert or reduce the damages arising from Steger's failure to comply with his contract was not raised by the evidence as to this second voyage of the Portuguese Prince, and that issue should not have been submitted to the jury. Counsel for appellant presents this contention with much force, but we think that, notwithstanding the facts that the Miller Bros.' horses were transported by appellant under the contract made with them by Steger, and that Steger at one time promised to pay any loss sustained by appellant from the substitution of these horses for the cargo that Steger had contracted to furnish, the issue of whether appellant could have averted or reduced the damages by using ordinary care to obtain some other cargo was in the case, and was properly submitted to the jury. As stated in our main opinion, we think Steger's testimony shows that his agreement to pay the damages that appellant might sustain by taking the Miller Bros.' horses in lieu of the cargo that Steger had failed to furnish was made under the belief that if appellant accepted the Miller Bros.' horses and transported them for his, Steger's, account, and under his agreement to pay any loss it might sustain thereby, the steamer would still remain chartered for the third voyage covered by the contract of charter, and would return to Galveston and transport his horses on said voyage.

We think the evidence further shows that appellant was not induced to take the Miller Bros.' horses by Steger's promise to pay this damage, but took them because that was the only cargo of horses available and it did not care to take any other kind of cargo. The testimony of appellant's agent, Warriner, shows that the steamer was not held at Galveston for Millers Bros.' horses at Steger's request, nor because of any promise of Steger, and it is also shown that appellant made efforts to get other cargoes of horses after Steger's offer of the Miller Bros.' horses was made to it.

In these circumstances we do not think Steger, after appellant, as he expresses it, had taken the boats away from him, should be held estopped as a matter of law from showing, in defense of appellant's claim for damages, that he offered appellant cargoes of hay which at the price he agreed to pay for its transportation would have netted appellant more than it could have made by

transporting his horses, or from showing that appellant by the exercise of ordinary care could have obtained other cargoes at a rate for transportation which would have been just as profitable to appellant as the transportation of Steger's horses.

In our main opinion we say:

"The contracts under which a large portion of these exports [referring to exports of cotton and other articles of commerce exported from Galveston in February and March, 1915] were shipped were made while the two ships of appellant before named were at Galveston and had found that Steger was unable to comply with his contract to furnish the cargoes of horses."

Appellant complains of this statement on the ground that it is not supported by the testimony of any witness. Upon a re-examination of the record we find that no witness testified that a large portion of the exports during the months named were shipped under contracts made during said months. All that is shown by the testimony is that contracts were made by ship brokers with various persons for shipments of said exports which moved during said months. The witness who testified as to these shipments stated that he could not tell how many of them moved in the months of February and March, but he could obtain that information from his books, and stated that he would produce it. The record does not show that the witness produced his books or the promised information. We correct our former statement as above indicated in response to appellant's complaint, and not because we regard our first statement as materially inaccurate.

[7] Appellant insists in its motion that we erred in not sustaining its assignment predicating error upon the refusal of the trial court to instruct the jury that the burden of proof was upon the defendant upon the issue of whether the plaintiff could have averted or reduced the damages by the use of ordinary care. In support of this contention appellant cites a number of cases, announcing the long-established rule that, such plea being an affirmative defense, the burden of proving it was upon the defendant. This rule is unquestionably sound in reason and universally sustained by the authorities, but this does not determine the question of whether the court committed error in not so instructing the jury. The charge given by the court submitted to the jury the question of whether the plaintiff could have, by the use of ordinary care to obtain the cargoes, averted or reduced the damages occasioned by the failure of the defendant to furnish the cargo he had contracted to furnish. It was proper to instruct the jury that they should determine this question in accordance with the preponderance of the evidence, but it was wholly unnecessary to tell them where the burden of proof lay. On the contrary,

it has been expressly held by our Supreme Court that a charge upon the burden of proof is not always necessary or proper. Blum v. Strong, 71 Tex. 321, 6 S. W. 167. We cannot see what possible assistance it could have been to the jury in this case in determining the issues presented to them to have been told where the burden of proof rested, and appellant could not possibly have been harmed by the failure of the court to give such instruction. We think the learned counsel for appellant has confused the question of burden of proof with that of the preponderance of the evidence.

[8, 9] Appellant also complains of the construction placed in our main opinion upon assignments Nos. 10 and 11. We say in that opinion that these assignments "complain of the verdict and judgment in favor of Steger for $24,000 on his cross-action for damages for the failure of appellant to comply with its contract for the shipment of hay," and then say in effect that, the trial court having required a remittitur of that judgment, it is unnecessary to discuss these assignments. These assignments are as follows:

"Tenth Assignment of Error—A Proposition.

"The verdict and judgment against the plaintiff, and the verdict in favor of the defendant Steger for $24,000, are contrary to the evidence, and are not supported by the evidence, and are not supported by the preponderance of the evidence, nor warranted by the evidence, because the evidence overwhelmingly reveals the facts and establishes the facts that the plaintiff performed all its obligations arising under the charter parties in full, and the defendant Steger breached his obligations arising thereunder by failure to provide horses when required so to do by the contract, and by failure to furnish the bankers' guaranty, or the substituted security therefor, by failure to pay the daily demurrage due under the contracts, and that the plaintiff exercised all the care to avert and reduce damage arising from Steger's breach of his contracts that a person of ordinary care would have done under the circumstances.

"Eleventh Assignment of Error—A Proposition.

"The verdict and judgment against the plaintiff, and the verdict in favor of the defendant Steger for $24,000, are contrary to the evidence, and are not supported by the evidence, and not supported by the preponderance of the evidence, and not warranted by the evidence, because the evidence overwhelmingly reveals the facts and establishes the facts that plaintiff could not have saved all loss and damage by the exercise of ordinary care in obtaining cargoes for either of the two voyages involved, the only offers of cargo revealed by the evidence being grain and hay of the defendant Steger, under these issues being bound to produce testimony sufficient to overcome the burden of proof cast upon him on the issue of due care and diligence on the part of the plaintiff to reduce or avert damage from Steger's breach of contracts. The evidence consisted only of general testimony that merchandise was passing through the port of Galveston, and the testimony on behalf of the plaintiff be

ing overwhelmingly that all loss and damage could not have been avoided by the exercise of ordinary care on the part of the plaintiff in obtaining cargo for the last two voyages of the Portuguese Prince and the last voyage of the Burmese Prince."

Appellant contends that these assignments assail the verdict and judgment against plaintiff on the whole case, and the verdict in favor of Steger for $24,000, and cannot be properly construed as only attacking the verdict and judgment against plaintiff and in favor of Steger on the cross-action for $24,000.

The assignments are susceptible of the construction appellant places upon them, and we will accept that construction and withdraw our former holding that they only refer to the verdict and judgment for $24,000.

For the statements under these assignments appellant copies portions of the court's charge, and then refers to the evidence set out on preceding pages 24 to 132 of its brief. A great deal of this evidence, which covers 108 pages of appellant's printed brief, has no bearing upon the issues presented by these assignments. We think it clear that rule 31 for the Courts of Civil Appeals (142 S. W. xiii) does not sanction a statement of this kind, and the assignments are not entitled to consideration because of the insufficiency of their supporting statements. However, the sufficiency of the evidence to sustain the verdict of the jury upon the issue of the exercise by the appellant of ordinary care to avert or reduce the damages has been passed upon under preceding assignments, and if these assignments could be considered they should be overruled.

Other assignments questioning the findings of the jury upon issues raised as to the alleged contract between Steger and appellant for the transportation of hay were not discussed in the main opinion, and will not be here discussed, because Steger's claim for $24,000 damages for the alleged breach by the appellant of a contract for the transportation of his hay having been eliminated by the remittitur filed by him, the question of whether a binding contract was made by appellant for the transportation of the hay is immaterial.

Upon the issue of ordinary care on the part of appellant to avert or reduce the damages, it was only necessary for Steger to show that by the use of such care it could have obtained substitute cargoes, the transportation of which would have yielded it sufficient profit to offset the loss sustained by the failure of appellee Steger to furnish his cargoes of horses. We think the evidence set out in our main opinion is sufficient to sustain a finding that appellant could have done this by taking the hay which was offered it by Steger, and the question of whether it bound itself by contract to take the hay cannot be material upon this issue.

Any assignment not discussed in this or our main opinion has been duly considered and overruled.

We are of opinion that the motion for rehearing should be refused; and it has been so ordered.

Refused.

GRAVES, J. (dissenting). After mature reconsideration of this cause on rehearing, I can see no escape for the appellee from liability for such loss and damage as appellant actually sustained upon the second voyage of the Portuguese Prince in carrying the Miller Bros.' horses to Genoa, Italy. Indeed, under the case as made, it seems to me he clearly admitted himself to be so bound as to that shipment and left nothing touching his responsibility for it to go to the jury. Accordingly, I think the court below erred in submitting to them the issue as to whether appellant used ordinary care to avert or rdeuce the damage flowing from that trip, and that its assignments 1 and 4, attacking that action, should have been sustained. A brief consideration of such parts of the record as bear directly upon the matter will, it is thought, demonstrate the correctness of this view.

With the Portuguese Prince lying in the harbor at Galveston since February 7, 1915, and Steger for many days in default upon his contract to furnish horses for her second voyage, during which period both he, his agents, and those of appellant had unsuccessfully scoured the country for a substitute cargo, on March 3, 1915, an agreement concerning a cargo for that trip was reached between them, and evidenced by the following letter:

"Galveston, Texas, March 3, 1915.

"Messrs. D. & G. Warriner, Agents Prince Line, Galveston, Texas—Gentlemen: This is to advise you that with telegraphic authority in hand and verbal instructions from Mr. E. D. Steger, we have this day relet for E. D. Steger account, the steamer Portuguese Prince with 1,187 head of horses for Genoa, at $80.00 per head, and will make an effort to secure a total of 1,200 head for this steamer; horses to be delivered in Galveston ready to load by March 12 (demurrage on and after that date at both Galveston and Geona to be at the rate of 150 L per day if steamer be detained at either port longer than forty-eight hours).

"Mr. Steger has advised us that he will be responsible for any additional damages or losses that might be proven by the Prince Line in handling this line of horses to Italy in lieu of his inability to furnish horses as per original contract.

"Yours very truly,

"The J. H. W. Steele Company,

"Agents for E. D. Steger.

"Dict. Mr. Steele."

Steger himself testified concerning this agreement:

"All the matters set out in the letter of March 3, 1915, to D. & G. Warriner from the J. H. W. Steele Company, agents for E. D. Steger, were matters of detail and were left entirely to Mr. Steele. Steele was my agent all the way through, and as my agent wrote the letter to agents of plaintiff, March 3, 1915, stating we had relet the Portuguese Prince to Miller Bros., and that I would be responsible for any additional damages or losses which might be proven by the plaintiff in handling this line of horses to Italy in lieu of my inability to furnish horses as per original contract. I made the charter party with Miller Bros. March 3, 1915, seven days after I made the verbal contract as to hay, February 24, 1915."

Now, the only excuse offered anywhere in this controversy as to why the appellee should not stand by this arrangement he so pointedly admits his agents made for him with full authority was that he had been relieved of it by the hay contract to which he refers in the last sentence of his quoted testimony. A hiatus appears there, however, in that he himself repeatedly says he did not make the Miller Bros. charter party until 7 days after making the verbal contract as to the hay, whereas the latter was repudiated by the boat owners and abandoned by him within 1 or 2 days after it had been agreed upon. That no possibility of inaccuracy may occur at this point, his own version of it is further quoted:

"The conference of February 24th was not followed up by making any record in black and white, and no confirmations were exchanged between us by telegraph or mail. On the contrary, I was almost immediately notified that it did not suit the Prince Line to convert the boat and carry hay. * * * I received that notice within a very few days—within a day or two, I got the information they would not carry the hay, and did not pursue it further. I had already engaged the boats and had them on my hands, and I was just hoping to put hay on if I could not get horses; and I did not have horses for this boat and wanted to load it. I didn't tender the hay because almost immediately he (Warriner) notified me that his people would not permit the horse fittings to be taken out. He had not made me any promise to find out whether the Prince Line would permit the removal of the horse fittings. He assumed they would permit it, and I assumed that they would. I knew Mr. Warriner was not the principal in the contract; I understood he was acting as agent of the Prince Line."

So that, under his own statement, the so-called hay contract, which had gone up in thin air at least 5 days before, could not have furnished a defense against the undertaking —subsidiary, of course, to his original contract for the Portuguese Prince—the appellee had assumed in his subletting of the boat to Miller Bros.; yet, in submitting the issues of ordinary care upon appellant's part as to the second trip of this vessel, the court permits the jury to regard this discarded hay contract as a complete defense to the claim

for damages arising from this voyage also, along with those pertaining to the other two. There was no difference made in the way the hay defense was submitted between the Miller Bros.' shipment and either of the other two voyages to which it was allowed to apply. The relevant parts of the charge, stripped of recitations immaterial to the question now under consideration and placed in what is considered appropriate sequence, were the following: In paragraph 4, after first saying it was appellee Steger's duty to load the vessels with horses within 48 hours after they were tendered him for that purpose, and to furnish banker's guaranty stipulated in the contract, that instruction concludes:

"Not having done either of these things, he was in default as to the second voyage of the Portuguese Prince and the third voyage of the Burmese Prince, and became thereby liable for all damages proximately caused by such default, unless there was some subsequent agreement releasing him."

Then succeed these general provisions:

"(5) But it was the duty of the plaintiff and its agents to do all that one of ordinary care could have done under the circumstances to prevent the damage altogether or to reduce it."

"(7) The defendant Steger having breached his contract for the steamer Portuguese Prince as above stated on its second voyage, unless it was otherwise agreed between the parties as hereinafter submitted," etc.

"(11) The defendant Steger claims that there was an agreement, between himself and the plaintiff through its agents, entirely releasing him from all damages on account of the failure to furnish horses or other breach of the charter parties, and that it consisted in his offer, on or about the 24th day of February, 1915, to them, in lieu of horses, of 24,000 tons of hay to be transported on the remaining three voyages of the vessels in question, 8,000 tons each trip, at the rate of $15 per ton, and their acceptance thereof."

As applying the general principles thus laid down, these particular questions were asked:

"(1) Did the plaintiff and its agents use such care to avert or reduce the damage arising from defendant Steger's breach of his contract for the performance of the second trip of the Portuguese Prince as a person of ordinary care would have done under the circumstances? Answer Yes or No."

"(6) Did the defendant Steger offer plaintiff's agents cargoes of hay amounting to 24,000 tons at $15 a ton, for the three voyages in controversy, and offer to pay for tearing out the horse fittings? Answer Yes or No.

"(7) If you answer interrogatory No. 6 'No,' you need not answer this one at all; but if you answer, 'Yes,' then state whether the agents of the plaintiff agreed to accept the cargoes of hay at the price stated, and release the defendant from the charter parties? Answer Yes or No.

"(8) Were the cargoes of hay referred to in interrogatory 6 ever in fact tendered, that is,

offered for loading, to the plaintiff or its agents? Answer Yes or No."

"(11) Could plaintiff have saved all loss and damage by the exercise of ordinary care in obtaining cargoes for the last two voyages of the Portuguese Prince? Answer Yes or No."

In other words, to state the net result and effect of these instructions as affecting the second voyage of the Portuguese Prince (the Miller Bros'. shipment), the jury were told that Steger was in default, and consequently liable for all damages caused thereby, unless they found that the hay agreement of February 24th, as particularized in succeeding paragraph 11, had been made between the parties, in which event he was entirely released. And the jury in responding found that very thing when they answered question No. 1 "No," and 6, 7, 8, and 11 "Yes." That these proceedings were in the very face of Steger's letter of March 3d of the undisputed testimony of all the witnesses, and of his own previously quoted admission concerning the outcome of the hay offer with reference to the Miller Bros'. transaction does not admit of a single doubt; neither will it do to say that appellant did not both plead and prove the Miller Bros'. subcontract and full performance thereof in every detail, because in paragraph 5 of its second amended petition, and again in paragraph 4 of the second supplemental petition, it was alleged with much detail that at Steger's request, for his use and benefit, and solely by way of minimizing the damages then already due it from him, appellant moved the cargo of horses he had contracted with Miller Bros. for, earned for him $90,000 thereon, and applied it to his credit. Under these allegations, the court below, without objection from anyone, admitted in evidence Steger's above-copied letter of March 3, 1915, promising to pay all loss and damages flowing therefrom if the Prince Line would recognize his subcharter party with Miller Bros., the subcharter contract itself, and uncontroverted proof that appellant fully performed it by transporting the horses as therein provided for.

And this undisputed, indeed frankly conceded, fact, that it did actually carry the Miller Bros.' horses, under, pursuant to and in compliance with the letter of March 3d as modifying for that trip the general contract for the three voyages of the Portuguese Prince —which, of course, was still subsisting in full force and effect—it seems to me, rendered wholly immaterial the matter of whether or not, up to that time, this vessel had been held in Galveston Harbor at Steger's request. For this reason I am unable to concur in the answer made in the majority opinions to appellant's first assignment, wherein it is said the contention there made rests upon the claim that the boat was held at Steger's request, when the evidence disclosed the con-

trary, part of Mr. Warriner's testimony being quoted to so demonstrate. This answering position is amplified in the opinion on rehearing, where it is stated that Steger's testimony showed his agreement to pay the damages appellant might sustain by taking the Miller Bros.' horses to have been made under the belief that "the steamer would still remain chartered for the third voyage covered by the contract of charter, and would return to Galveston and transport his horses on said voyage." An examination of the assignment referred to will disclose, however, that it was not grounded solely on the mere matter of the steamer's having been held at Steger's request or not—even if Mr. Warriner's statement as a whole shows it was not—but urged the error of the court in submitting at all the issue of ordinary care as to this second voyage of that vessel, the Portuguese Prince, upon the ground that the practically undisputed evidence demonstrated that such care had been used, and that Steger had so solemnly bound himself to relieve appellant of all loss thereon as to preclude him from complaining, or from claiming any lack of such care as to that trip. It therefore does not meet the issue raised by the first assignment to say, as the majority do, that "the undisputed evidence shows that the ship was not kept at Galveston at Steger's request."

But is this court justified in making the finding just quoted from the fact that Mr. Warriner in one part of his evidence so stated? I think not, because he further testified as follows:

"The contract with Miller Bros. is dated March 3d. The vessel was held there after that date, awaiting horses from Miller Bros., the horses we expected to be furnished under the contract between Steger and Miller Bros. The vessel was fixed to load horses for Miller Bros. at Galveston. When the time approached for loading, the horses were not forthcoming. Mr. Steele did all the telegraphing and informed me that there was some trouble had developed with the Texas quarantine law under which they would not be allowed to bring the horses through Texas from Oklahoma, and so it became necessary to load the horses from New Orleans."

Moreover, Steger himself corroborated these last statements of Warriner by repeatedly testifying:

"I wanted the boats held at all times. * * * I repeat that, without seeing the telegram, I could not tell about dates, but that it was my wish always that the boats be held. I communicated that fact to Mr. Steele—always. I knew of the quarantine in the way of shipping the Miller Bros.' horses, and other things; and I tried to help, myself, with the state authorities to get them to haul the horses, let them come through Texas, and did not succeed. * * * I was reasonably well advised about the movement of the Miller Bros.' horses. I made no protest with reference thereto."

So that the evidence of Mr. Warriner quoted by the court that he did not "hold the boat here at anybody's request" must be read as qualified by Mr. Warriner himself, and by the other undisputed evidence, this time including even Steger's, that the Portuguese Prince was in fact held after March 3, 1915, for Steger's benefit and to fulfill his contract with Miller Bros. That is necessarily what Mr. Warriner means when his two apparently inconsistent statements are considered together. If, then, Steger secured that action from appellant, can he yet say, despite the express terms of the agreement contained in his letter, that it was negligent before that in holding the vessel at Galveston? At any rate, if he could say so, he does not; he says under oath:

"I am not complaining of the Prince Line moving the Miller Bros.' horses. I wanted the boats held all the time. I am complaining that they took the boats away too quick."

And if he is not complaining, if he wanted this boat held all the time, what legal difference can it make whether appellant held it there at his request or not? The fact remains that it was held; that he used it in carrying out his contract with the Millers in precise accord with his written agreement with appellant. It does seem to me that the legal effect of all this evidence was such as to place the Miller Bros.' shipment entirely without the pale of the hay defense, and in that instance, at least, to preclude the appellee from availing himself of it; it was demonstrably aftermath, if not confessedly afterthought. Walker v. Erwin, 47 Tex. Civ. App. 637, 106 S. W. 164; Express Co. v. Taylor, 156 S. W. 617.

Furthermore, if there is a syllable of evidence anywhere in this record justifying any belief upon appellee's part, which the majority upon rehearing say his testimony shows, that as a result of his assuming full responsibility for the Miller Bros.' shipment the Portuguese Prince would return to Galveston and transport his own horses on her third voyage, it has evaded a diligent search, no representative of appellant so assured, agreed with, or had him to believe, as he himself says in the testimony already quoted:

"I had already engaged the boats and had them on my hands, and I was just hoping to put hay on if I could not get horses; and I did not have horses for this boat and wanted to load it."

In other words, his original contract for all three voyages of that boat was still in-tact, and his intermediate and subsidiary undertaking to pay any losses upon the Miller Bros.' cargo had nothing whatever to do with its remaining so. In all these circumstances, not being in any manner induced by the opposite party, his belief was not only without justification, but wholly immaterial. Being in admitted default upon his still subsisting original contract for three voyages, with the vessel knocking at his gates for a cargo of horses he did not have for only her second one, he simply crossed this one intermediate bridge when he came to it, and closed all issues of liability as to that trip by his letter of March 3d. The trial court should have so held.

It is conceivable that the hay transaction might be held not to have been established with sufficient definiteness, considering the fact that it was pleaded as an unconditional contract, to form the basis of damages in Steger's favor, and yet, though falling short of becoming a mutually binding obligation, be made to serve as a defense to appellant's claims for damages growing out of other voyages than that for Miller Bros. This for the reason that a proper offer of the hay for those trips, all other essentials concurring, without an actual agreement to accept it, might relieve Steger from the consequences of his inability to furnish cargoes of horses for them, upon proof that the hay would have been a more profitable one. In my view, unless a distinction could so be made between the hay arrangement as a contract and as a mere showing that loss could have been averted, the trial court's action in requiring a remittitur of the $24,000 recovered by Steger, and yet allowing the judgment against appellant to stand would be illogical and inconsistent. But, to reiterate what has before been said, what I cannot understand is how, under the undisputed proof and the appellee's own contracts and admissions, this hay defense can be extended to cover the Miller Bros.' shipment also. While doubt, like a brooding presence, hovers over the entire case, there is none with me as to that feature of it; resolving all others in favor of the judgment, that I cannot yield.

I think the motion should be granted and the judgment reversed as to the claim for damages on the Miller Bros.' shipment, and remanded with instructions to the trial court to determine the amount of loss and damage suffered by appellant in that respect, and then to enter judgment in its favor therefor, together with costs.